IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL GARDUNO,

        **Plaintiff,**

    **vs.**                                    **Civ. No. 22-15  JFR**

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration,

        **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15)[2] filed March 18, 2022, in connection with Plaintiff's *Motion for Remand* and *Brief in Support,* filed May 18, 2022.  Docs. 22 and 23.  Defendant filed a Response on July 25, 2022.  Doc. 24.  Plaintiff filed a Reply on August 2, 2022.  Doc. 25.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is not well taken and is **DENIED**.

## I.  Background and Procedural Record

Plaintiff Michael Garduno (Mr. Garduno) alleges that he became disabled on March 6, 2010, at the age of fifty-five,[3] because of a learning disability, right ankle problems, left foot problems, right knee problems, back problems, bipolar disorder, and sleep apnea.  Tr. 108, 409.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 19, 20, 21.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 15), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

[3] Mr. Garduno amended his onset date at the August 27, 2020, Administrative Hearing.  Tr. 15, 84.

Mr. Garduno completed the seventh grade and attended special education classes while in school.[4]  Tr. 410.  Mr. Garduno worked as a construction laborer and manufacturing parts cleaner.  Tr. 410.  Mr. Garduno stopped working on July 1, 2009, due to his medical conditions.  Tr. 409.

On December 30, 2014, Mr. Garduno protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*.  Tr. 343-48.  On April 30, 2015, Mr. Garduno's application was denied.  Tr. 107-111, 112, 170-74.  It was denied again at reconsideration on October 15, 2015.  Tr. 122, 123-36, 183-86.  Upon Mr. Garduno's timely request, Administrative Law Judge (ALJ) Michael Leppala held a hearing on May 4, 2017.  Tr. 39-75.  Mr. Garduno appeared with attorney representative Maryann D'Arcangelis.  *Id*.  On December 7, 2017, ALJ Leppala issued an unfavorable decision.  Tr. 137-54.

On December 10, 2019, the Appeals Council remanded the case to a different ALJ based a constitutional issue raised by claimant's counsel.  The Appeals Council explained that

> [t]he representative raised a challenge under the Appointments Clause of the Constitution, U.S. Const. Art. II, § 2, cl. 2, to the manner in which the Administrative Law Judge was appointed.  This case is remanded to a different Administrative Law Judge.  Any Appointments Clause defect is cured by this remand because, on July 16, 2018, the Acting Commissioner of Social Security ratified all Administrative Law Judge appointments and approved them as her own under the Constitution.

Tr. 162.

On August 27, 2020, a second hearing was held before newly-assigned ALJ Jennifer Fellabaum.  Tr. 76-106.  Mr. Garduno again appeared with attorney representative Maryann

---

[4] Elsewhere, Mr. Garduno stated he completed the 8th grade and 9th grade.  Tr. 539, 547.

D'Arcangelis.[5]  On December 7, 2020, ALJ Fellabaum issued an unfavorable decision.  Tr. 12-

31.  On November 10, 2021, the Appeals Council issued its decision denying Mr. Garduno's

request for review and upholding the ALJ's final decision.  Tr. 1-4.  On January 7, 2022,

Mr. Garduno timely filed a Complaint seeking judicial review of the Commissioner's final

decision.  Doc. 1.

## II.  Applicable Law

### A.     Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income

disability benefits for adult individuals).  The Social Security Commissioner has adopted the

familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria

as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in
> "substantial gainful activity."[6]  If the claimant is engaged in substantial gainful
> activity, he is not disabled regardless of his medical condition.
>
> (2) At step two, the ALJ must determine the severity of the claimed physical or
> mental impairment(s).  If the claimant does not have an impairment(s) or
> combination of impairments that is severe and meets the duration requirement,
> he is not disabled.

---

[5] Ms. Garduno is represented in this proceeding by Jennifer L Dunn.  Doc. 1.

[6] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R.
§§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less,
or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for
pay or profit."  20 C.F.R. §§ 404.1572(b).

3

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

   **B.**    **Standard of Review**

   The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal

standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley*, 373 F.3d at 1118, or if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency.  *Langley*, 373 F.3d at 1118.

### III.  Analysis

The ALJ made her decision that Mr. Garduno was not disabled at step four of the sequential evaluation and made alternative findings at step five.  Tr. 28-31.  The ALJ determined that Mr. Garduno met the insured status requirements of the Social Security Act through June 30, 2010, and that he had not engaged in substantial gainful activity from his amended alleged onset date of March 6, 2010, through his date last insured.  Tr. 18.  She found that Mr. Garduno had severe impairments of intellectual disability and depressive disorder.  *Id.*  The ALJ also found that all of Mr. Garduno's alleged physical impairments were nonsevere.  Tr. 18-19.  The ALJ determined, however, that Mr. Garduno's impairments did not meet or equal in severity any of

the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1.

Tr. 19-23.  Accordingly, the ALJ proceeded to step four and found that through the date last

insured Mr. Garduno had the residual functional capacity to

> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: He could perform simple, routine tasks with no
> fast-paced production work.  He could make simple work decisions.  The work
> should be performed in the same location every day.  The work should not involve
> any significant reading or writing.

Tr. 23-28.  The ALJ determined that Mr. Garduno could perform his past relevant work as a

general laborer and construction worker.  Tr. 28-29.  The ALJ also determined that considering

Mr. Garduno's age, education, work experience, and residual functional capacity, there are jobs

that exist in significant numbers in the national economy that he can perform.[7]  Tr. 681-83.  The

ALJ, therefore, concluded that Mr. Garduno was not disabled.  *Id.*

In support of his Motion, Mr. Garduno argues that (1) the ALJ failed to adhere to agency

policy and Tenth Circuit precedent when considering the opinion of psychological consulting

examiner Eligio R. Padilla, Ph.D.; (2) the ALJ erred at step three by finding that Mr. Garduno

did not meet the requirements of Listing 12.05B – *Intellectual Disorder*; and (3) the appointment

of Andrew Saul as Commissioner of the Social Security Administration, removable only for

cause, violates separation of powers, and the ALJ's decision was therefore constitutionally

defective.

For the reasons discussed below, the Court finds that the ALJ applied the correct legal

standards in evaluating Dr. Padilla's opinion and that her explanations for according

---

[7] The vocational expert testified that Mr. Garduno would be able to perform the requirements of representative
occupations such as a Kitchen Helper, DOT #318.687-010, which is performed at the medium level with an SVP of 2
(148,000 jobs in national economy); a Dining Room Attendant, DOT #311.677-018, which is performed at the medium
exertional level with an SVP of 2 (31,000 jobs in the national economy); and a Laboratory Equipment Cleaner, DOT
#381.687-022, which is performed at the medium exertional level with an SVP of 2 (26,000 jobs in the national
economy).  Tr. 30.

Dr. Padilla's opinion partial weight were supported by substantial evidence.  The Court also

finds that the ALJ did not err in determining that Mr. Garduno did not meet the criteria for

Listing 12.05B at step three.  Finally, the Court finds that Mr. Garduno's constitutional argument

does not warrant remand.

A.      **Eligio R. Padilla, Ph.D.**

On January 4, 2010, Mr. Garduno presented to Eligio R. Padilla, Ph.D., for psychological

evaluation based on a referral from the Disability Determination Services.  Tr. 538-44.

Dr. Padilla took a history of Mr. Garduno's present condition.  Tr. 539.  Mr. Garduno described,

in pertinent part, that

> [h]e worked as a laborer in construction, mostly laying pipe, but struggled to stay
> employed because he had so much difficulty following directions.  He worked for
> thirteen years for the city of Cheyenne, Wyoming, in refuse collection.   City
> officials helped him get a driver's license despite his illiteracy.  He returned to
> New Mexico, and tried working as a cook's helper, but could not read the orders or
> follow rapid-fire, multi-step directions.  His last job was two or three years ago
> when he worked as a laborer laying asphalt.  He again had trouble following
> directions and his back was interfering with his ability to physically do the work.
> . . .  With problems following directions and problems engaging in physical labor
> because of worsening back pain, the range of employment possibilities shrank to
> virtually nothing, especially in difficult economic times when companies can set
> higher physical and cognitive standards for any needed laborers.

Tr. 539.  On mental status exam, Dr. Padilla observed, *inter alia*, that Mr. Padilla's memory

seemed to be grossly intact, but that his attention and concentration seemed at least mildly

compromised.  *Id.*  Dr. Padilla further observed that Mr. Garduno was

> oriented in terms of person, place, time and situation.  Eye contact was normal and
> his attitude toward the examiner was cooperative.  His mood was mildly dysphoric
> and his affect was consistent with his mood, the content of his limited discourse
> and his facial expression.  He  expressed feelings of helplessness, hopelessness and
> growing pessimism, but denied suicidal ideation.   He also denied homicidal
> ideation.   No preoccupations were noted and he denied any hallucinations,
> delusions, ideas of reference or any other symptoms suggestive of a thought
> disorder.  Executive functions, such as his fund of knowledge, his ability to think

abstractly, his decision-making, his judgment, and his insight, all seemed compromised by very low intellectual functioning.

Tr. 539-40.

Dr. Padilla administered the Wechsler Adult Intelligence Scale (WAIS-IV).  Tr. 540-41. Dr. Padilla noted results indicating that Mr. Garduno's verbal comprehension was extremely low; his perceptional reasoning was low average; his working memory was borderline; his processing speed was borderline; his general ability was extremely low; and his full scale IQ was extremely low.  *Id.*  Dr. Padilla made an Axis I diagnosis of depressive disorder NOS and a provisional Axis II diagnosis of mild intellectual incapacity.  *Id.*  Dr. Padilla assessed an Axis V GAF score of 50.[8]  Id.

Dr. Padilla completed a *Psychological Source Statement of Ability To Do Work-Related Activities* on Mr. Garduno's behalf.  Tr. 543-44.  Based on Mr. Garduno's WAIS-IV results, Dr. Padilla assessed that Mr. Garduno had *mild limitations* in his ability to (1) understand and remember very short and simple instructions; (2) be aware of normal hazards and react appropriately; and (3) use public transportation or travel to unfamiliar places.  *Id.*  He assessed that Mr. Garduno had *moderate limitations* in his ability to (1) attend and concentrate; (2) interact with public; and (3) interact with coworkers.  *Id.*  Dr. Padilla assessed that Mr. Garduno had *marked limitations* in his ability to (1) understand and remember detailed or complex instructions; (2) carry out instructions; (3) work without supervision; (4) interact with supervisors; and (5) adapt to changes in workplace.  *Id.*

---

[8] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

The ALJ accorded partial weight to Dr. Padilla's opinion.  Tr. 26-27.  The ALJ explained that Dr. Padilla's assessment related to Mr. Garduno's ability to understand and remember instructions and to sustain concentration and pace were consistent with the record as a whole, including the WAIS-IV, and "suggests that the claimant can perform the range of work indicated in the residual functional capacity."  *Id.*  The ALJ further explained that

> Dr. Padilla's opinion regarding the claimant's moderate to marked limitations in social interaction and marked limitations in his ability to adapt to changes in the workplace is inconsistent with the record as a whole prior to the date last insured, which does not indicate any longitudinal difficulties in the claimant's appearance or ability to manage himself around others (1F-3F).[9]  Furthermore, it is inconsistent with the claimant's testimony at the hearing, where he mostly discussed difficulty reading and writing, and did not report having had difficulty interacting with others at past jobs or adapting to changes in the workplace (Hearing Testimony).  Therefore, the undersigned gives only partial weight to Dr. Padilla's opinion.

*Id.*

Mr. Garduno argues that the ALJ failed to properly consider the relevant regulatory factors when weighing Dr. Padilla's opinion.  Doc. 23 at 7-8.  For example, Mr. Garduno argues that Dr. Padilla is the only examining source to assess Mr. Garduno's ability to do work-related

---

[9] Exhibit 1F is Dr. Padilla's Psychological Evaluation (Tr. 538-44); Exhibit 3F is a February 16, 2010, Disability Determination Examination by Harry R. Burger, D.O. (Tr. 549-50).  Dr. Burger opined in pertinent part that

> [Mr. Garduno] does purport to be illiterate.  I think to a significant degree he is; nonetheless, he can read, he can do simple math, he reads small books to his granddaughter.  He purports he cannot fill out applications on his own because most of them are computer generated, which is not common for his type of work activity.  He also has no answer why his wife could not help him fill out these. . . .  He has never pursued education as a workplace desire, and I feel has no mental or physical restrictions that would prevent him from continuing one of his previous job activities for gainful employment.  It appears from his description that he does not get his driver's license back because he owes child-support money of significance.

Tr. 550.  The ALJ accorded Dr. Burger's opinion partial weight.  Tr. 27.  The ALJ explained that Dr. Burger's opinion that Mr. Garduno had no mental limitations was not supported by the evidence and was inconsistent with the standardized testing results.  *Id.*  The ALJ explained that "[s]uch evidence indicates that the claimant had an intellectual disability, which would reasonably result in some limitations as indicated in the residual functional capacity."  *Id.*

mental activities; that Dr. Padilla is a licensed psychologist providing an opinion in his area of

specialty; that Dr. Padilla's assessment was supported by objective evidence, *i.e.,* the WAIS-IV;

and that Dr. Padilla's assessment is consistent, in part, with State agency nonexamining

psychological consultant Renate Wewerka, Ph.D.'s Section I findings that Mr. Garduno had

moderate limitations in his ability to (1) sustain an ordinary routine without special supervision;

(2) accept instructions and respond appropriately to criticism from supervisors; and (3) set

realistic goals or make plans independently of others.[10]   *Id.*

　　　　Mr. Garduno next argues that the ALJ failed to provide good, specific, and supported

reasons for discounting Dr. Padilla's opinion.  Doc. 23 at 8-10.  In support, Mr. Garduno argues

that the ALJ's explanation that certain limitations were inconsistent with the record as a whole

---

[10] On October 7, 2015, State agency nonexamining psychological consultant Renate Wewerka, Ph.D., reviewed Mr. Garduno's medical evidence record at reconsideration. Tr. 131-34.  Dr. Wewerka prepared a *Psychiatric Review Technique* and rated the degree of Mr. Garduno's functional limitation in the area of understanding, remembering or applying information as *mild*; the area of interacting with others as *mild*, in the area of maintaining concentration, persistent and pace as *moderate*, and no repeated episodes of decompensation. Tr. 131.  Dr. Wewerka also prepared a *Mental Residual Functional Capacity Assessment* and assessed that Mr. Garduno had *moderate limitations* in his ability to (1) remember locations and work-like procedures; (2) carry out very short and simple instructions; (3) sustain an ordinary routine without special supervision; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) accept instructions and respond appropriately to criticism from supervisors; (6) respond appropriately to changes in the work setting; and (7) set realistic goals or make plans independently of others.  Tr. 133-34.  She assessed that Mr. Garduno had *marked limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions.  *Id.*  Dr. Wewerka explained that "[t]here is no evidence suggesting clmt would not have been able to perform unskilled work during the time period in question, as no weight can be given to psych CE and opined marked limitations, with the exception of marked limitations in understanding, remembering, and carrying out complex or detailed instructions." Tr. 131.

The ALJ accorded partial weight to Dr. Wewerka's assessed limitations. Tr. 25-26.  The ALJ explained that

> [h]er opinion regarding the claimant's marked limitation in carrying out detailed instructions and moderate limitation in remembering locations and work procedures is consistent with standardized testing results . . . .  However, the remaining limitations assessed by Dr. Wewerka are inconsistent with the record as a whole, which indicates that the claimant successfully held jobs with no issues of sustaining the work routine or responding to changes in the work environment and self-reported issues only being that he could not read instructions (1F-3F; Hearing Testimony).  Furthermore, the claimant indicated that, if a job did not require reading, the claimant could perform it independently (Hearing Testimony).

Tr. 26.

"prior to the date last insured" amounts to speculation because there is no medical evidence available in the file prior to Mr. Garduno's date of last insured.  *Id.*  Mr. Garduno argues that given the complex nature of his intellectual disability, the results of the psychological testing, his depressive disorder, and the remote nature of his date last insured, "the ALJ should have obtained testimony from a medical expert to determine the impact of his severe impairments on his functional capacity at the time of his date last insured to either substantiate the findings of Dr. Padilla or provide a basis for a conflicting RFC."  *Id.*

The Commissioner contends that in giving partial weight to Dr. Padilla's opinion, the ALJ noted that the opinion was generally consistent with other evidence and accounted for in the RFC finding, with the exception of Dr. Padilla's opinion that Mr. Garduno had moderate and marked limitations in social interaction and a marked limitation in the ability to adapt to changes in the workplace, which limitations were contradicted by Mr. Garduno's testimony that other than his problems with reading and completing forms and finding someone to give him a ride to and from the worksite, he had no difficulty performing his past relevant work.  Doc. 24 at 12-14. The Commissioner also contends that the ALJ's evaluation of Dr. Padilla's opinion does not amount to "lay opinion" because it is the ALJ's duty to evaluate the opinion evidence.  *Id.*  The Commissioner further contends that the ALJ is only required to seek additional evidence or ask for medical expert opinion if she cannot come to a disability determination without obtaining the additional evidence.  *Id.*  Here, the Commissioner contends, there is no indication the ALJ found the record to be deficient or that she was unable to come to a conclusion about Plaintiff's disability absent obtaining additional evidence.  *Id.*

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.[11]  *See* 20 C.F.R. §§ 404.1527(c); *see also Hamlin,* 365 F.3d at 1215 ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional.").  "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs*., 52 F.3d 288, 290 (10th Cir. 1995)).[12]  An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007).  However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).  An ALJ is required to give controlling weight to the opinion of a treating physician if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir.

---

[11] The agency issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.).  However, because Mr. Garduno filed his initial claim on January 20, 2015, the previous regulations for evaluating opinion evidence apply to this matter.  *See* 20 C.F.R. 416.927.

[12] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 404.1527(c)(2)-(6).

12

2004).  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."  *Hamlin*, 365 F.3d at 1215.

Ultimately, the ALJ must give good reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" for the weight that she ultimately assigns the opinion.  *Langley*, 373 F.3d at 1119 (citation omitted).  Failure to do so constitutes legal error.  *See Kerwin v. Astrue*, 244 F. App'x. 880, 884 (10th Cir. 2007) (unpublished).  In addition, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted).  Instead, an ALJ "must ... explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.  Further, the Commissioner may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision." *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

The Court finds that the ALJ applied the correct legal standard in evaluating Dr. Padilla's opinion regarding Mr. Garduno's ability to do work-related mental activities and that her reasons for according partial weight are supported by substantial evidence.  In her determination, and contrary to Mr. Garduno's argument, the ALJ noted Dr. Padilla's specialty, indicated that Dr. Padilla was an examining source, and stated that Dr. Padilla's opinion was supported with a psychological examination that included standardized testing results.  Tr. 26.  These findings, therefore, demonstrate the ALJ considered and discussed relevant regulatory factors when evaluating Dr. Padilla's medical opinion evidence.[13]  Further, as for Mr. Garduno's argument

---

[13] The regulations provide that *generally* more weight is given to the medical opinion of a source who has examined you, to opinions supported by medical signs and laboratory findings, to opinions of specialists, and to opinions that are consistent with the record as a whole.  *See* 20 C.F.R. § 404.1527(c)(1), (3)-(5).

that the ALJ overlooked the consistency of certain of Dr. Wewerka's assessed limitations with Dr. Padilla's assessed limitations, Mr. Garduno's argument overlooks that Dr. Wewerka ultimately determined there was no evidence suggesting Mr. Garduno would not have been able to perform unskilled work during the time period in question.[14]  Tr. 131.  As such, the ALJ's ultimate determination that Mr. Garduno retained the mental capacity for unskilled work is consistent with Dr. Wewerka's assessment.[15] [16]  Last, the ALJ provided specific and legitimate reasons for determining that certain of Dr. Padilla's assessed limitations were not consistent with the record as a whole, *i.e.,* that Mr. Garduno testified that other than his difficulties with reading, he did not report having had difficulty interacting with others at past jobs or adapting to changes in the workplace.  *Id.*  The record supports this explanation.  Tr. 94, 403, 539, 547-50.[17]

        The Court also finds that the ALJ's evaluation of Dr. Padilla's opinion was not "lay opinion" nor was the ALJ required to seek medical expert testimony to determine the impact of Mr. Garduno's impairments on his ability to do work-related mental activities.  As discussed above, the Court finds the ALJ applied the correct legal standards in evaluating Dr. Padilla's opinion evidence and provided specific and legitimate reasons for according it partial weight.

---

[14] *See* fn. 10, *supra.*

[15] Mr. Garduno does raise an issue regarding the ALJ's evaluation of Dr. Wewerka's opinion evidence.

[16] *See Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015) (explaining that unskilled work generally requires only the following: (1) "[u]nderstanding, remembering, and carrying out simple instructions"; (2) "[m]aking judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions"; (3) "[r]esponding appropriately to supervision, co-workers and usual work situations"; and (4) "[d]ealing with changes in a routine work setting.") (citations omitted)).

[17] The ALJ asked at the Administrative Hearing, "For all those jobs other than not being able to read the instructions or the order sheets and complete paperwork were you otherwise able to do the work you were doing?"  Mr. Garduno answered, "Yes."  Tr. 94.  Mr. Garduno represented on his Function Report that he got along well with authority figures and had never been fired or laid off from a job because of problems getting along with people.  Tr. 403.  Mr. Garduno explained to Dr. Padilla that his inability to read and following directions interfered with working.  Tr. 539.  Mr. Garduno reported to Dr. Burger that he was not presently working because most work places would require him to use a computer to submit an application and he could not fill out the forms.  Tr. 547.

Additionally, an ALJ considers the consistency of medical opinion evidence with the "*record as a whole*," and not just other medical evidence as Mr. Garduno argues.  *See* 20 C.F.R. § 404.1527(c)(4).  Therefore, the ALJ's consideration of Mr. Garduno's testimony and his workplace challenges due to his inability to read as reported to Dr. Padilla and Dr. Burger[18] falls squarely within the regulatory requirement.  *Id.*  As for obtaining a medical expert, application of Section I-2-5-34 of the Administration's Hearing, Appeals, and Litigation Manual in this case, if any, would be discretionary.[19]  That said, Mr. Garduno has failed to point to any medical evidence that is "contradictory, inconsistent, or confusing,"[20] failed to demonstrate how Dr. Padilla's objective findings are unclear, and failed to support that the ALJ expressed any doubt about the adequacy of the medical record thereby requiring the assistance of a medical expert.  Merely citing the standard without evidence is insufficient.  Mr. Garduno's argument, therefore, has no merit.

   **B.** **Listing 12.05B**

   Mr. Garduno next argues that the ALJ erred at step three of the sequential analysis when she failed to address certain of Dr. Padilla's assessed marked limitations in making her 12.05B assessment.  Doc. 23 at 11-12.  Mr. Garduno argues that the evidence establishes that Mr. Garduno's intellectual deficits meet/equal Listing 12.05B on the basis of the lowest valid IQ score of record, 66, and the fact that Mr. Garduno continues to have marked deficits in adaptive

---

[18] *See* fn. 9, *supra.*

[19] *See* HALLEX I-2-5-34 – When to Obtain Medical Expert Opinion (explaining under Section A when an ALJ must obtain an ME opinion (not discretionary) and under Section B when an ALJ may obtain an ME opinion (discretionary)).

[20] Mr. Garduno refers to his intellectual disability as "complex"; however, Dr. Padilla's provisional diagnosis indicates "*mild* [intellectual disability]."  Tr. 542 (emphasis added).

functioning.  *Id.*  Mr. Garduno further argues that an intellectual disability by definition is a developmental disability that occurs in childhood.  *Id.*

The Commissioner contends that the ALJ reasonably found that Mr. Garduno did not meet the requirements for Listing 12.05B at step three of the sequential analysis.  Doc. 24 at 7-10.  To begin, the Commissioner concedes that Mr. Garduno meets the first and third criteria under 12.05B.  *Id.*  The Commissioner disagrees, however, that Mr. Garduno meets the second criteria of 12.05B.  *Id.*  The Commissioner explains that the ALJ, not a doctor, assesses the paragraph B criteria at steps two and three of the sequential analysis based on all relevant evidence, including Dr. Padilla's opinion, and determines the degree of limitation in each of the four categories of mental functioning.[21]  *Id.*  The Commissioner further explains that Dr. Padilla's assessment of Mr. Garduno's ability to do *work-related* mental functions is not the same as the paragraph B criteria used to determine the *severity* of mental impairments in the first instance at steps two and three of the sequential analysis.[22]  *Id.*  As such, the Commissioner contends that Dr. Padilla's functional assessment is not the same as the ALJ's severity assessment.

Last, the Commissioner notes that State agency nonexamining psychological consultant Dr. Wewerka assessed Mr. Garduno's impairments using the four "paragraph B" criteria at step two and found that Mr. Garduno had *mild restrictions* in his activities of daily living; *mild*

---

[21] Understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.

[22] "The psychiatric review technique described in 20 CFR § 404.1520a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" (if applicable) criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

*difficulties* in maintaining social functioning; *moderate difficulties* in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.[23]  *Id.*  Dr. Wewerka, therefore, similarly found that Mr. Garduno did not satisfy the criteria of Listing 12.05B.[24]

Listing 12.05 – *Intellectual Disorder* - has two paragraphs, designated A and B, and a claimant can satisfy the listing requirements by meeting the criteria of either paragraph. 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.05.  Paragraph A requires that a claimant have (1) significantly subaverage general intellectual functioning evident in cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; (2) significant deficits in current adaptive functioning manifested by dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and (3) evidence about current intellectual and adaptive functioning and a history that demonstrates or supports the conclusion that the disorder manifested before age 22.  *Id.*  Signs may include, but are not limited to, poor conceptual, social, or practical skills evident in adaptive functioning.  *Id.* Mr. Garduno is not alleging that he meets the criteria of Paragraph A.

Paragraph B requires the following:

1.  Significantly subaverage general intellectual functioning evidenced by a or b:

    a.  A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

---

[23] The SSA has revised Listing 12.05, and the current version became effective March 27, 2017.  The current version removed the term "episodes of decompensation" from all mental disability listings and now uses "adapt and manage oneself."  *See Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66,138 n.1 (Sept. 26, 2016). Episodes of decompensation were defined, *inter alia*, as exacerbations or temporary increases in symptoms or signs accompanied by a *loss of adaptive functioning*, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  *See* POMS DI 34132.011C.4 (emphasis added).

[24] *See* fn. 10, *supra*.

b.      A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.      Significant deficits in adaptive functioning currently manifested by an extreme limitation of one, or marked limitation of two, in the following areas of mental functioning:

a.      Understand, remember, or apply information (see 12.00E1); or
b.      Interact with others (see 12.00E2); or
c.      Concentrate, persist, or maintain pace (see 12.00E3); or
d.      Adapt or manage oneself (see 12.00E4); and

3.      The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

*Id.*

In making her Paragraph B2 findings, the ALJ assessed that Mr. Garduno had a *marked* limitation in understanding, remembering or applying information; a *moderate* limitation in concentrating, persisting, or maintaining pace; a *mild* limitation in adapting or managing oneself; and *no limitation* in interacting with others. Tr. 19. The ALJ explained, therefore, that the Paragraph B requirements were not met because there was insufficient evidence of significant deficits in adaptive functioning manifested by an extreme limitation of one, or marked limitation of two, in the above-listed areas of mental functioning.

Mr. Garduno disputes the ALJ's finding with respect to Mr. Garduno's limitations in adapting and managing oneself. The ALJ explained her finding in this area of mental functioning as follows:

As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant reported difficulty handling stress and adapting to changes in routine (2E/7; Hearing Testimony). However, on his November 2009 function report, he acknowledged being able to shop in stores, which suggests intact ability to manage himself appropriately in public areas and around others (2E/4). In addition, mental status examinations conducted prior to the date last insured

18

> typically described him to be cooperative with normal speech and eye contact, and no issues with his appearance or hygiene, although he was noted to have a mildly dysphoric mood with congruent affect at a January 2010 consultative examination (1F/2; 3F/3).  At the hearing, he communicated and responded to all questioning in an appropriate manner, which again suggests intact ability to adapt or manage himself around others (Hearing Testimony).  This evidence supports no more than a mild limitation in adapting or managing oneself.

Tr. 20.  Mr. Garduno does not dispute this evidence nor does he dispute the ALJ's step two findings.  Instead, Mr. Garduno relies solely on Dr. Padilla's assessment that Mr. Garduno has marked limitations in his ability to work without supervision, interact with supervisors, and adapt to changes in the workplace to support a greater severity rating.  Dr. Padilla's assessed marked limitations, Mr. Garduno argues, support a marked limitation in adapting and managing oneself at step two.  The Court is not persuaded.  The Court agrees with the Commissioner that Dr. Padilla's assessed limitations regarding Mr. Garduno's ability to do work-related mental functions is not the same as the ALJ's findings at steps two and three of the sequential analysis regarding the severity of Mr. Garduno's mental impairments.  Moreover, as discussed above, the ALJ provided specific and legitimate reasons for discounting Dr. Padilla's marked assessments based on evidence from the record as a whole which the Court found to be supported by substantial evidence.  As such, Mr. Garduno's argument is without merit.

For the foregoing reason, the Court finds the ALJ did not err in her step three findings.

**C.**     **Constitutional Violation**

Last, Mr. Garduno argues that the decision denying his benefits is constitutionally defective because the ALJ who decided his case was appointed by Commissioner Andrew Saul.  Doc. 23 at 13-14.  Mr. Garduno explains that pursuant to the removal provision of 42 U.S.C. § 902(a)(3),[25] Mr. Saul was protected from removal from office absent "cause."  *Id.*  This

---

[25] "The Commissioner shall be appointed for a term of 6 years, except that the initial term of office for Commissioner shall terminate January 19, 2001. In any case in which a successor does not take office at the end of a Commissioner's

protection, Mr. Garduno explains, has been held to be unconstitutional by the Supreme Court in

*Collins v. Yellen*, 141 S.Ct. 1761 (2021)[26] and *Seila Law LLC v. Consumer Fin. Prot. Bureau*,

140 S.Ct. 2183 (2020).[27]   *Id.*   In each of these cases, the Supreme Court considered a federal

_____

term of office, such Commissioner may continue in office until the entry upon office of such a successor. A Commissioner appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term. An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." 42 U.S.C.A. § 902(a)(3).

[26] In *Collins v. Yellen*, a group of shareholders ("the plaintiffs") argued that the structure of the Federal Housing Finance Agency ("FHFA") violated the separation of powers, as it was led by a single director who could be removed by the President only for cause. 141 S. Ct. 1761, 1770 (2021) (citing 12 U.S.C. § 4512(a), (b)(2)). Specifically, the plaintiffs challenged the constitutionality of the third amendment to an agreement that the FHFA entered into with the U.S. Department of Treasury. *Id.* The FHFA, an independent agency created by the Housing and Economic Recovery Act of 2008 ("Recovery Act"), was tasked with regulating mortgage financing institutions including Fannie Mae and Freddie Mac. *Id.* The FHFA placed Fannie Mae and Freddie Mac into conservatorship and negotiated agreements with the Treasury. *Id.* Under the third amendment to the agreement between the FHFA and the Treasury, Fanny Mae and Freddie Mac transferred immense amounts of wealth to the Treasury. *Id.* Insisting that the statutory removal protections on the FHFA Director rendered its structure unconstitutional, the plaintiffs urged the Court to entirely undo the third amendment. *Id.* In support, they asserted that the third amendment was adopted and implemented by executive officers who lacked constitutional authority on account of their removal restrictions, which the plaintiffs maintained rendered both the amendment and its implementation void *ab initio*. *Id.* at 1787.

The Supreme Court agreed that the statutory restrictions on the President's power to remove the FHFA Director were unconstitutional, but it disagreed with the plaintiff's position that the officers of the FHFA therefore acted outside of their constitutional authority. *Id.* The Court reasoned that "[a]ll the officers who headed the FHFA during the time in question were properly *appointed*." *Id.* The Court explained:

> [a]lthough the statute unconstitutionally limited the President's authority to remove the [FHFA's] confirmed Directors, there was no constitutional defect in the statutorily prescribed method of *appointment* to that office. As a result, there [was] no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id.* (emphasis added). The Court emphasized that there was no reason to conclude that the FHFA head lacked the authority to carry out the functions of the office. *Id.* at 1788. Referencing *Seila Law*, the Court reasoned that "[s]ettled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-11).

[27] In *Seila Law*, the Supreme Court considered whether the structure of the Consumer Financial Protection Bureau ("CFPB"), and specifically its limits on the President's removal powers, violated the U.S. Constitution's separation of powers. 140 S. Ct. at 2191. The CFPB, an independent regulatory agency within the Federal Reserve system, investigated a law firm for violating the law while providing debt-relief services. *Id.* at 2191 (describing CFPB's role), 2194 (discussing CFPB's action against the law firm). The CFPB issued a civil investigative demand ("CID"), which sought information and documents related to the law firm's practices. *Id.* at 2194. The Supreme Court likened the CID to a subpoena. *See id.* The law firm refused to comply with the CID, and the CFPB filed a petition in federal court to enforce it. *Id.* The law firm defended its noncompliance by asserting that the structure of the CFPB violated the Constitution's separation of powers. *Id.* The district court found no constitutional violation and granted the CFPB's petition. *Id.* at 2194-95. The law firm appealed, and the Ninth Circuit affirmed. *Id.* The Supreme Court granted certiorari. *Id.*

agency with a single director who, under the applicable statute, could only be removed by the President "for cause," and held that this "for cause" removal protection was unconstitutional in the case of these two agencies.[28]   The Office of Legal Counsel agreed that these holdings were applicable to the Social Security Commission and on July 8, 2021, issued an opinion in which it concluded that "[w]e think the best reading of *Collins* and *Seila Law* leads to the conclusion that, notwithstanding the statutory limitation on removal, the President can remove the SSA Commissioner at will."  *See Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot.*, 2021 WL 2981542 (July 8, 2021).

Mr. Garduno argues that only the Commissioner can make findings of fact and issue final decisions as to benefits eligibility.  Doc. 23 at 12-13.  Mr. Garduno argues that because the Commissioner's insulation from removal by an accountable President is unconstitutional, the entirety of the Social Security Administration's structure is unconstitutional.  Doc. 23 at 12-13.

---

The Supreme Court observed that, unlike traditional executive agencies, "Congress provided that the CFPB would be led by a single Director, who serves for a longer term than the President except for inefficiency, neglect, or malfeasance." *Id.* at 2191. The Court described the CFPB's structure as "incompatible with the structure of the Constitution" because it concentrated significant governmental power in a single individual who was "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is." *Id.* at 2202-03. Further, the Court held that the CFPB did not fall within either of two recognized exceptions to unrestricted Presidential removal power. *Id.* at 2205-06. Noting that "[i]n our constitutional system, the executive power belongs to the President[,] ... includ[ing] the ability to supervise and remove the agents who wield executive power in his stead[,]" the Supreme Court held that the limits upon the President's authority to remove the Director of the CFPB were unconstitutional. *Id.* at 2211. The Court remanded, instructing the lower courts to determine whether the issuance of the CID was ratified by an Acting Director removable at will by the President. *Id.* at 2208-11.

The Supreme Court also broached the issue of the SSA's structure in *Seila Law*, though arguably in dicta. The Court noted that the SSA was run by a single Administrator and that the constitutionality of its structure had been questioned by former-President Clinton upon signing it into law. *Id.* at 2202 (citing Public Papers of the Presidents, William J. Clinton, Vol. II, Aug. 15, 1994, pp. 1471-72 (1995)). The Court stopped short of finding unconstitutional the for-cause restriction on removal of the SSA Commissioner; however, it described the agency's structure as "controversial." *Id.* The Court observed that, in contrast to the CFPB, "the SSA lacks the authority to bring enforcement actions against private parties[, and i]ts role is largely limited to adjudicating claims for Social Security benefits." *Id.*

[28] *See* fns. 26 and 27, *supra*.

With that in mind, Mr. Garduno argues that because the Commissioner delegates authority to an ALJ and the Appeals Council to hear and decide a case, the ALJ's and Appeals Council's delegation of authority is necessarily constitutionally defective.[29]  *Id.*  Therefore, Mr. Garduno argues, the ALJ and Appeals Council decided this case under invalid regulations promulgated by a Commissioner with no constitutional authority.  *Id.*  Relying on *Collins*, Mr. Garduno concludes that because this case involves misconduct by government actors, the harm he suffered should be presumed and he should not have to show a direct compensable harm between the ALJ's adjudication of Mr. Garduno's disability claim and the alleged separation of powers violation in the removal statute that applies to the Commissioner.  Doc. 25 at 6-7.

The Commissioner concedes that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause.  Doc. 24 at 15-22 (citing *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot.*, 2021 WL 2981542).  Without more, however, the Commissioner contends that this conclusion does not support setting aside an unfavorable SSA disability benefits determination.  *Id.*  The Commissioner states that *Collins* instructs that even where a unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm.  *Id.*  Here, the Commissioner contends, Mr. Garduno cannot and has not made such a showing.  *Id.*  The Commissioner cites the Ninth Circuit and forty-nine district court decisions from around the country that have considered Mr. Garduno's argument and repeatedly denied relief.  *Id.*

---

[29] In his Reply, Mr Garduno states that "[e]ven if it were conceded that the adjudicators had been properly appointed, that does not mean that the delegation of authority they received from Commissioner Saul was constitutionally sound. The two issue are not inherently interdependent and in fact Plaintiff does not challenge the adjudicators' appointments."  Doc. 25 at 5.

According to Mr. Garduno, "[g]iven the unlawful exercise of power by government actors in the instant case, the analysis of *Collins* suggests that harm should be presumed for the violation of this claimant's constitutional rights."  Doc. 25 at 6-7.  This misreads the Supreme Court's holding in *Collins* and other cases on the issue.  *See Lewis v. Comm'r of Soc. Sec.,* No. CV 21-1202-KSM, 2022 WL 1136687, at *5 (E.D. Pa. Apr. 18, 2022) (finding that claimant's argument that because "neither the ALJ nor the Appeals Council had a lawful delegation of authority to adjudicate [her] claim, ...*Collins* [*v. Yellen*] suggests that harm should be presumed" misreads the Supreme Court's holding in *Collins* and other cases on the issue).  In *Collins*, the Court found unconstitutional a similar removal provision in the Housing and Economic Recovery Act, which limited the President's ability to remove the director of the Federal Housing Finance Agency.  141 S.Ct. at 1784 ("A straightforward application of our reasoning in *Seila Law* dictates the result here.  The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power.").  The plaintiffs argued that because the Act unconstitutionally limited the President's ability to remove the agency's director, actions taken by the agency under that director's tenure were void.  *Id.* at 1787 ("In support of their request, [the plaintiffs] contend that the third amendment was adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*.").  The Supreme Court disagreed, finding that such an argument was "neither logical nor supported by precedent."  *Id.*  The Court emphasized that "[a]ll the officers who headed the FHFA during the time in question were properly *appointed*" and "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that

office." *Id.* "As a result, there [wa]s no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void." *Id.*

Here, Mr. Garduno attempts to distinguish *Collins* by arguing that in *Collins* the Court indicated that harm could not be presumed because *Collins* did not involve a government actor's exercise of power that the government actor did not lawfully possess, whereas here, "neither the ALJ nor the Appeals Council [] had a lawful delegation of authority under which to adjudicate and decide this disability claim." Doc. 25 at 6. But the Court in *Collins* necessarily rejected a similar leap in logic when it found the directors of the FHFA were properly appointed despite the unconstitutional limit on the President's ability to remove those directors. And because they were properly appointed, they had the authority to act as they did and those actions were not void *ab initio.* So too here. *See Samsel v. Kijakazi*, No. 4:21-CV-00962, 2022 WL 4120154, at *21–22 (M.D. Pa. Sept. 9, 2022) (rejecting claimant's argument that the regulations under which the case was decided were unconstitutionally promulgated by Commissioner Saul because he was not properly appointed, and therefore did not have the power to promulgate them); *Reilly v. Kijakazi*, No. 7:20-CV-237-D, 2022 WL 3206179, at *6 (E.D.N.C. July 19, 2022), *report and recommendation adopted sub nom. Reilly v. Kijakazi*, No. 7:20-CV-237-D, 2022 WL 3162343 (E.D.N.C. Aug. 8, 2022) (same and citing cases); *Lewis,* 2022 WL 1136687, at *5 (same); *Numan v. Saul*, No. 20-CV-1978-WVG, 2022 WL 891111, at *10–11 (S.D. Cal. Mar. 24, 2022) (explaining that *Seila Law, LLC* and *Collins* reflect that the relevant language from the governing removal statutes that violated separation of powers were severable from other provisions governing the operations of the CFPB and the FHFA and that both agencies' operations could continue and their decisions could still stand); *Robinson v. Kijakazi*, No. 21-CV-238-SCD, 2022 WL 443923, at *6–7 (E.D. Wis. Feb. 14, 2022) (finding claimant's argument rests on the false

24

premise, rejected in *Collins,* that the unconstitutional removal clause somehow taints all the Commissioner's actions, including his delegation of authority to others to decide individual disability claims); *Campbell v. Comm'r of Soc. Sec. Admin.,* No. CV-20-02048-PHX-JAT, 2022 WL 34677, at *3 (D. Ariz. Jan. 4, 2022) (explaining that the *Collins* Court made clear that "the unlawfulness of the removal provision does not strip [agency directors] of the power to undertake the other responsibilities of their office," particularly where there is no argument that the director was not properly appointed). Thus, even if the Social Security Act's provisions limiting the removal of an appointed Commissioner are unconstitutional, that does not mean that the Commissioner's appointment—or any actions taken pursuant to that appointment—are unconstitutional. *Lewis*, 2022 WL 1136687, at *5. And because the removal provision does not taint the Commissioner's authority, neither does it taint delegations of that authority to the ALJ and Appeals Council or actions taken pursuant to that delegated authority. *Id.*

      *Collins* further instructs that harm cannot be presumed where the case does not involve a government actor's exercise of power that the government actor did not lawfully possesses. *Collins*, 141 S.Ct. at 1788. The same is true in this case. *See Lewis,* 2022 WL 1136687, at * 17 n.2 ("Under *Collins*, a plaintiff raising such a challenge must demonstrate specific harm."). Here, harm cannot be presumed because this case does not involve a government actor's exercise of power that the government actor did not lawfully possess. Additionally, Mr. Garduno has not made any showing of how the alleged constitutional violation caused any compensable harm in this specific situation. *Collins,* 141 S.Ct. at 1779 ("plaintiff must show that it has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'") (citation omitted). Plaintiff is not required to show that the ALJ

would have decided the appeal differently and awarded benefits.  Yet, plaintiff must show compensable harm.

In *Collins*, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements.  *Id.* at 1774.  The plaintiffs in *Collins* thus had an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment.  *See id* at 1789.

In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner.  Mr. Garduno has not identified any new regulations, agency policies, or directives Commissioner Saul installed that may have affected his claims.  Mr. Garduno does not allege that former Commissioner Saul played any role in deciding his claim.  Nor does he allege that President Biden or former President Trump would have intervened to stop the Commissioner from acting but-for the unconstitutional removal clause in § 903(a)(3).  And it is unlikely he could.  *See Collins*, 141 S.Ct. at 1802 (Kagan, J., concurring) ("[G]iven the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all— would need to be undone.... When an agency decision would not capture a President's attention, his removal authority could not make a difference.").  Mr. Garduno thus fails to show how or why the § 902(a)(3) removal clause possibly harmed him.

For the foregoing reasons, Mr. Garduno's constitutional arguments do not warrant remand for further hearing.[30]  *See C.L.D. v. Kijakazi*, No. 21-CV-02216-NYW, 2022 WL 4448481, at *6 (D. Colo. Sept. 23, 2022); *see also Kotellos v. Kijakazi*, No. 21-CV-01032-RM, 2022 WL 3212928, at *3 (D. Colo. Aug. 9, 2022) (explaining that to have standing, a plaintiff must allege an injury traceable to an "allegedly unlawful" action (or threatened action) and seek a remedy to redress that action, and that the removal restriction had no effect on the ALJ's decision).

## IV.  Conclusion

For the reasons stated above, Mr. Garduno's Motion for Remand (Doc. 22) is **DENIED.**

_____

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge,**
**Presiding by Consent**

---

[30] Because the Court finds that Mr. Garduno's constitutional claim lacks merit for the above reasons, the Court does not address the Commissioner's alternative arguments (*i.e.,* harmless error, *de facto* officer, the rule of necessity, and other prudential considerations).